929 So.2d 601 (2006)
Amber RUSSELL, Appellant,
v.
AGENCY FOR PERSONS WITH DISABILITIES, Appellee.
No. 1D05-5150.
District Court of Appeal of Florida, First District.
May 8, 2006.
Paolo Annino, Mary Clark and Carol Gregg, Tallahassee, Florida State University College of Law, Children's Advocacy Center, Tallahassee, for Appellant.
Nancy W. Gregoire of Bunnell, Woulfe, Kirschbaum, Keller, McIntyre, Gregoire & Klein, P.A., Fort Lauderdale; Andrea Moore, Executive Director, Florida's Children First, Coral Springs; Bernard P. Perlmutter, Director and Assistant Clinical Professor, UM School of Law Children & Youth Law Clinic, Coral Gables; Hubert Grissom, General Counsel and Gayle Miller, Senior Attorney, Advocacy Center for Persons With Disabilities, Inc., Tampa; Jodi Siegel, Executive Director, Southern Legal Counsel, Inc., Gainesville; Anne Swerlick, Deputy Director, Florida Legal Services, Inc., Tallahassee, for Amici Curiae.
Dennis W. Moore, General Counsel and Thomas Wade Young, Appellate Counsel, Statewide Guardian ad Litem Office, Orlando, for Amicus Curiae, Florida Guardian Ad Litem Program.
Katie George, District Legal Counsel and Eric D. Schurger, Assistant District Legal Counsel, Department of Children and Families, Local Counsel for the Agency *602 for Persons With Disabilities, Pensacola, for Appellee.
VAN NORTWICK, J.
Amber Russell, a developmentally disabled child in Florida's foster care system, appeals a final order denying her placement on the so-called "crisis tier" of the waiting list for services through the developmental services home and community based waiver program that is administered by the Florida Agency for Persons With Disabilities (Agency).[1] It is undisputed in this record that Amber meets one of the three alternative grounds for receiving crisis services because she is presently a danger to herself or others. We reject the Agency's contention that it was not required to grant Amber "crisis status" solely because she is currently in foster care and could theoretically receive the developmental services she requires through the family safety program within the Florida Department of Children and Families (DCF). Although witnesses for the Agency testified that the services needed by Amber "should" be available through the DCF family safety program, it is undisputed that the developmental services she needs are not actually available through any DCF program. The Agency has cited no legal basis for its contention that the family safety program must provide the needed developmental services and, as a result, Amber is not eligible for the crisis tier. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

Statutory and Regulatory Background
Medicaid is a joint health care program of the federal and state governments established pursuant to Title XIX of the Social Security Act to provide medical assistance to low-income individuals and families. 42 U.S.C. § 1396 et seq. The general guidelines for the Medicaid program are set forth in the federal statutes and regulations and are adopted into specific state laws and rules in each state. 42 U.S.C. § 1302. In each state, a "single state agency" is responsible for administering the Medicaid program. 42 C.F.R. § 431.10. In Florida, the Agency for Health Care Administration (AHCA) is designated as the Florida state agency authorized to make payments to qualified providers for medical assistance and related services on behalf of eligible individuals. See § 409.902, Fla. Stat. (2005). Foster children, like Amber, are eligible for Medicaid benefits. § 409.903(4), Fla. Stat. (2005). The record reflects that, pursuant to an interagency agreement, at the time of Amber's application DCF determined Medicaid eligibility for its clients.
Medicaid is the primary funding source for services for income-qualified developmentally disabled individuals, such as Amber. In Florida, payments for optional Medicaid services may be made on behalf of income-qualified persons in need of care in a licensed intermediate care facility for the developmentally disabled. § 409.906(15), Fla. Stat. (2005). To better utilize Medicaid funding, however, states are moving developmentally disabled individuals from institutions to home and community settings. See generally, Jane Perkins *603 & Randolph T. Boyle, Symposium: Addressing Long Waits for Home and Community Based Care Through Medicaid and the ADA, 45 St. Louis U. L.J. 117, 119 (2001). The Medicaid Act allows states to obtain waivers from the federal Department of Health and Human Services which excuse compliance with particular statutory and regulatory requirements and permit states to implement waiver programs that allow Medicaid payments for services for developmentally disabled persons in their home or community. Id. at 125; see 42 C.F.R. § 440.180. Mirroring the federal regulation, AHCA's rules authorize the developmental services waiver as a home and community based waiver program. See rule 596-8.200(9)(c), Fla. Admin. Code. This AHCA rule incorporates by reference the Developmental Services Waiver Services Florida Medicaid Coverage and Limitations Handbook (Handbook), which contains a description of various criteria and procedures applicable to the waiver program. Id. at rule 596-8.200(12). Relevant excerpts from the Handbook are a part of the record of this proceeding.
"The goal of these waiver programs is to provide services to persons at home or in the community and thereby avoid placing them in a hospital or nursing facility . . . [These] waivers can be used to access Medicaid services that are normally not available to Medicaid beneficiaries, including [among other things] habilitation. . . ." Perkins & Boyle, 45 St. Louis U. L.J. at 125. Because of the high demand for these waiver services, many states have long waiting lists. Id. at 126. The record reflects that, at the time that DCF found Amber eligible for the waiver, Florida's waiting list for the developmental services waiver program included approximately 14,000 people.
To receive the home and community based care waiver, an individual must be determined eligible for the waiver. The individual then is placed on a waiting list. Pursuant to the Handbook, certain individuals who are deemed to be "in crisis" may be placed at the top of the waiting list. The Handbook refers to this "crisis" status as the top tier of the waiting list, and persons on this crisis tier are allowed to be served more quickly.
The tests for determining crisis status are set forth in a document known as the "crisis identification tool," which is a part of the record here. The crisis identification tool sets forth three factors for determining whether an individual is in "crisis" and, therefore, requires immediate placement: danger to self or others; homelessness; and caregiver unable to give care. Once an individual is placed on the crisis waiting list, a determination must be made as to her needs compared to the needs of others in crisis. First priority on the crisis list is given to those individuals who are homeless and require emergency placement. Second priority is given to persons who are in danger of confirmed abuse or neglect or are exhibiting behaviors that will result in harm to that person or others. Third priority is given to any individual whose caregiver is no longer able to provide care.
Appendix F of the Handbook defines the requirement for what is referred to as the second priority crisis status, as follows:
Presently, the individual is either in danger because of confirmed abuse or neglect, or is exhibiting behaviors that
 result in harm to the person or others that, in turn, creates a life-threatening situation for the person or others, or
 will result in bodily harm to the person or others that will require emergency medical care from a physician if waiver services are not provided immediately. *604 Handbook F.5. Once an individual is determined to be in crisis because she is a danger to herself or others, the Handbook lists thirteen elements which must be examined when placing an individual in order of severity of crisis.

Factual and Procedural Background
Amber, who was born in 1991, is developmentally disabled with a full scale IQ of 64. She has been diagnosed with post-traumatic stress disorder, attention deficit hyperactivity disorder, borderline intellectual functioning, adjustment disorder with mixed disturbance of emotions and conduct, reading disorder, disorder of written expression and mathematics disorder. After a traumatic childhood, during which she was the victim of physical and sexual abuse, the parental rights of both her parents were terminated in 2001. Since then, she has resided in thirteen different foster homes and residential facilities. There is no dispute in this record that Amber exhibits patterns of dangerous behavior. For example, it is alleged that she killed a cat or kittens at one of her foster homes, and on another occasion she cut herself with glass. She has a history of running away, threatening suicide, and using poor judgment in dangerous situations. She has destroyed personal property which has resulted in charges against her and in her arrest. She has been committed for inpatient psychiatric treatment five times pursuant to the Baker Act. See § 394.451 et seq., Fla. Stat. (2005).
On November 12, 2003, Amber's family safety program caseworker applied for a developmental services home and community based waiver seeking intensive behavioral services, nonresidential support services, and companion services for Amber. It is undisputed that Amber is eligible for this waiver because she is a danger to herself or others. The DCF developmental disabilities program determined that Amber was eligible for the waiver services and, on February 12, 2004, placed her on the waiting list for the waiver as number 14,182. As discussed above, persons new to the developmental disabilities program may only be served in order of placement on the waiting list, unless the applicant is determined to be in crisis.
Sharon Stephens, a support coordinator for the developmental disabilities program, completed the crisis identification tool on behalf of Amber. Ms. Stephens noted that Amber fell into the category of danger to self or others, and that she was in need of additional services. "Amber is in need of services that will assist her with maintaining her self-control and coping with environmental situations that occur in her life. She would benefit from Behavioral Analysis, Non-Residential Supports and Services, and Companion services."
Tony Gelabert, a board certified behavioral analyst for the developmental disabilities program, also advised the DCF central office that Amber met the "crisis" criteria. Mr. Gelabert advised: "I agree that this child has the very real potential to seriously jeopardize her own safety and that she meets the definition of danger to self and others." Amber's case was then referred to the central office of DCF.
It is undisputed that DCF's developmental disabilities program central office did not examine the extent to which any of the crisis criteria applied to Amber or how the family safety program was serving her. The DCF central office crisis team determined that, because Amber is in foster care, she has sufficient services available to her. Marianne Ferlazzo, program administrator, recommended that Amber not be granted crisis status because "Family Safety needs to serve." On April 7, 2004, the developmental disabilities program issued a letter of denial to Amber stating *605 that she had not been determined to be in crisis and that she had been placed on a waiting list to receive a Medicaid waiver.
Amber requested a fair hearing pursuant to 42 C.F.R. § 431.200. A fair hearing was held before a hearing officer from DCF's Office of Appeal Hearings. See § 120.80(7) and Fla. Admin. Code Rule 65-2.042.
At the hearing, Amber's guardian ad litem, Kelly Bennett, testified that the foster care system could not deal with someone with Amber's level of complexity. Her caseworker, Amanda Jones, testified that, although Amber receives certain services through the family safety program, these services are not sufficient. Moreover, she felt that Amber needed to be placed in a facility with other children at her level. She said she had "no placements for kids who are as low functioning as she is." She opined that Amber "needs to have intensive individual therapy on a daily basis to work through her issues and. . . we just were unable to provide that for her." Ms. Jones, who formerly was employed by DCF in the family safety program, currently works for the Children's Home Society in Tallahassee, Florida, which has a contractual arrangement with DCF to administer foster care services as a community based care (CBC) provider. See § 409.1671, Fla. Stat. (2005). She acknowledged an ability to access psychological services but said "we don't have the funding to make sure she gets the services she needs." Mr. Gelabert testified, disagreeing with Ms. Jones' opinion that Amber's residential needs could not be satisfied by the family safety program. However, he agreed that she needed additional behavior analysis services because she is a danger to herself or others, which he felt placed her in crisis. He opined that Amber meets the definition of "danger to self and others."
DCF's witness, Ms. Ferlazzo, testified that, in recommending denial of crisis status, she considered the fact that Amber was in the foster-care system and already entitled to a number of services. She expressed doubt that a foster child had ever been granted crisis status. She said it was not part of the crisis process to check whether the family safety program was adequately caring for Amber.
The hearing officer affirmed the denial of crisis status. On appeal, this court reversed and remanded the proceeding to DCF to issue a corrected order addressing the criteria for second priority status in the Handbook. Russell v. Dep't of Children and Family Servs., 910 So.2d 881 (Fla. 1st DCA 2005) (Russell I). In the meantime, the Agency was created, supra note 1, and took responsibility for the developmental services waiver. The Agency was substituted for DCF and is now the appellee.[2]
On remand, the hearing officer accepted Ms. Jones' testimony that "Family Safety has not and cannot provide the services" that Amber requires. However, the hearing officer misconstrues Ms. Jones' testimony to be that it was the responsibility of the Children's Home Society to provide those services. In her conclusions of law, the hearing officer compounds that mistake by concluding "[t]here has been testimony that the Foster Care System must meet [Amber's] services needs," when there was no such testimony in the record. *606 The hearing officer concluded that Amber is in need of services "in excess of those that are provided by the State plan Medicaid [sic]." The hearing officer found that "[t]he evidence indicated the petitioner could benefit from services she is not presently receiving, such as behavior analysis, non-residential supports and companion services." Nevertheless, without a finding of fact or citation of authority, the hearing officer rejected the concept that Amber could receive different services in the waiver program than she was presently receiving.
The hearing officer found that Amber was eligible for services through the family safety program, Medicaid state plan and the Department of Education. The hearing officer commented that Medicaid is the "payer of last resort" pursuant to federal and state law.[3] Accordingly, she opined that "Developmental Disabilities does not typically serve foster care children under the age of 18 for these reasons." However, once Amber turns 18, the hearing officer found she could be served under the developmental disabilities waiver because she would "have aged out of the Foster Care System."[4]
Turning to this court's requirement in Russell I that the hearing officer address the Handbook's required criteria for second priority status, see Russell I, 910 So.2d at 881, the hearing officer respectfully disagreed with this court that these criteria were pertinent to the initial determination of crisis status. Specifically, the Handbook contemplates two waiting lists: the standard waiting list where individuals are served in order based on the date they apply when slots become available based on funding; and the crisis waiting list, where individuals who are determined to be in crisis are served based on the severity of their needs compared to the needs of others in crisis.
As discussed above, the Handbook lists thirteen elements which must be examined when determining if an individual should be given second priority crisis status. While we agree with the hearing officer that the criteria used to determine whether an individual should be given second priority status are not strictly applicable to the initial determination of crisis, we believe these criteria are instructive when applying the crisis identification tool. These thirteen criteria are as follows:
(i) With immediate provision of waiver services, the health and safety of this individual or others in the household are at risk.
(ii) The frequency and intensity of the injury to self or others is high.
(iii) It appears the individual or others are at high risk for serious injury, or permanent damage.
(iv) There is reasonable possibility for fatal or life threatening injury.

*607 (v) No other supports or services are available to assist in addressing the behaviors.
(vi) Other reasonable behavioral assessments and interventions have been attempted but have proven ineffective.
(vii) The relative ages, sexes, and sizes of the aggressor and the individuals subject to his or her aggression place the individuals subject to the aggression at great risk.
(viii) The caregiver has insufficient ability or capabilities to handle the individual.
(ix)The age or disability of the individual or caregiver exacerbates the problem.
(x) There has been law enforcement involvement.
(xi) Protective Services has been involved.
(xii) There has been documented injury to self or others requiring medical treatment.
(xiii) Individual requires services of greater intensity . . .
The hearing officer examined each of these criteria and determined that, with the exception of (v), they each applied to Amber's situation. The hearing officer concluded, however, that Amber was not in crisis solely because "she has the potential to have her needs met through the Foster Care Program." (emphasis supplied).

Issue on Appeal
We must start with a restatement of the obvious: it is undisputed that Amber is emotionally disturbed and she is developmentally disabled. We are not concerned with services that can be provided to her to treat any emotional disturbance she may have, but rather services that she requires because she is developmentally disabled. The record reflects that the Medicaid waiver services she seeks will provide such services as habilitation services, which are designed to allow her to be independent. Foster children like Amber are particularly in need of services "because they are more likely than others to have suffered neglect or abuse and to have behavioral health care needs." Perkins & Boyle, 45 St. Louis U. L.J. at 121.
Next, we recognize that the Agency's Medicaid waiver funding is limited and must be carefully allocated to better meet the needs of all of Florida's citizens. The issue here, however, does not involve funding limitations. We are not deciding whether the Agency must provide Amber with any specific waiver services. The issue before us is whether she can be denied crisis status as a matter of law because she is a foster child entitled to certain services under chapter 409, Florida Statutes.
Addressing this issue, the Agency concedes that Amber is a danger to herself or others, but argues that Amber can be served through the services available under chapter 409 (foster care services) and chapter 394 (providing for comprehensive child mental health services), and therefore it is not necessary to provide services under chapter 393 (The Developmental Disabilities Prevention and Community Services Act).
Amber responds that she presented uncontradicted evidence that the services she needs have not been provided and are not otherwise available from DCF, which administers services under chapter 409 and the Comprehensive Child and Adolescent Mental Health Services Act, sections 394.490 through 394.497. This evidence shows that Amber has not received the services she needs in the thirteen foster homes and residential programs in which she has been placed and that she will not receive the services she needs from the family safety program. Amber argues persuasively that there is no legal or factual basis for the Agency's position that the *608 services she needs "should be available" from DCF.

Analysis
Section 20.197(2), Florida Statutes (2005), provides:
The agency shall be responsible for the provision of all services provided to persons with developmental disabilities pursuant to chapter 393, including the operation of all state institutional programs and the programmatic management of Medicaid waivers established to provide services to persons with developmental disabilities.
This enabling legislation vests the Agency with the sole authority to administer and distribute federal matching funds, including waiver funds, for the services it provides. "The agency shall be a separate budget entity not subject to control, supervision or direction by [DCF] . . ." § 20.197, Fla. Stat. (2005). In the same legislation creating the Agency, the legislature amended section 408.302(1) to require AHCA to enter into an interagency agreement with DCF and the Agency "to assure coordination and cooperation in serving special needs citizens." Ch.2004-267, § 84 at 1140, Laws of Fla.
The statutory framework makes clear that the Agency for Persons with Disabilities is the agency mandated to provide services to the developmentally disabled. Section 393.13, Florida Statutes (2005), "The Bill of Rights of Persons Who are Developmentally Disabled," declares the legislature's intent that the "system of care provided to individuals who are developmentally disabled must be designed to meet the needs of the clients as well as protect the integrity of their legal and human rights." § 393.13(2)(a), Fla. Stat. (2005). Section 393.063, Florida Statutes (2005), defines "client" as "any person determined eligible by the Agency for services under this chapter." § 393.063(4), Fla. Stat. (2005).
No one questions that Amber is developmentally disabled as contemplated by chapter 393. She is seeking behavioral services, and behavioral services for developmentally disabled individuals are available under chapter 393, section 393.066(3)(m), Florida Statutes (2005), subject to the limitation that the Agency is required to provide services only "within available resources." § 393.13(3)(c), Fla. Stat. (2005). Finally, and most important to the resolution of this case, section 393.064(1), Florida Statutes (2005), requires the Agency to engage in an interagency effort to develop plans which have the potential to correct or reduce the severity of developmental disabilities.
Turning now to chapter 409, which governs the provision of foster care services, the parties have not cited a statutory provision, and our separate research has not found a provision, which designates DCF and its contractors as the exclusive providers of all the necessary services that foster children, such as Amber, need. In fact, the language of applicable statutes indicates just the opposite. For example, section 409.1451(1)(a), Florida Statutes (2005), requires DCF to provide "independent living transition services" to assist older children in foster care to "make the transition to self-sufficiency as adults;" however, the services provided under this statute do not address the needs of children with developmental disabilities, like Amber. See § 409.1451(4). Further, while section 409.165(1) requires DCF to provide psychiatric residential treatment facilities "within funds appropriated," other than Amber's Baker Act commitments, which did not address Amber's developmental disabilities, the record reflects no evidence that services for seriously developmentally disabled foster children are actually available, and the record shows no attempt to place Amber in a facility that could address her needs.
*609 Importantly, in chapter 409, the legislature contemplated that there should be a joint effort by the state agencies to serve children like Amber who are developmentally disabled and emotionally disturbed. The legislature acknowledged that the child welfare system is disjointed and that a lack of collaboration exists among different state agencies. § 409.1673(1)(d) and (e), Fla. Stat. (2005).[5] Thus, the legislature specifically directed that there should be a plan for interagency collaboration to provide the array of services required to meet the needs of dependent children in the care of DCF. § 409.1673(3)(c), Fla. Stat. (2005).
While the Agency maintains that Amber's extraordinary needs can be met by her Baker Act placement in inpatient residential treatment facilities, we cannot agree. First, the undisputed evidence in the record before us shows that repeated Baker Act placements have not addressed Amber's needs. Further, the legislature expressly recognizes that placement in inpatient residential facilities could be avoided if comprehensive residential service options were made available. § 409.1673(1)(c), Fla. Stat. (2005). Moreover, the Agency's reliance on Baker Act proceedings to solve Amber's array of problems is not supported by the statutes. Certainly, child mental health services are available pursuant to the Comprehensive Child and Adolescent Mental Health Services Act. DCF is only required, however, to serve children with serious emotional disturbances "to the extent that resources are available." § 394.493(1) and (3). Here, there is a complete absence of record evidence that would show that the necessary services are available to Amber under this Act.
Turning next to the Agency's contention that it was the Children's Home Society's duty to serve Amber's developmentally disabled service needs, we can discern no such legislative intent. Section 409.1671, which outsources foster care to community based providers, requires the provision of "related services," but section 409.1671(1)(a) does not require a CBC, like Children's Home Society, to provide all necessary services to its clients. Without contradiction from the Agency, amici curiae state in their brief that
[w]hen the CBCs entered into contracts to assume DCF's responsibility to serve foster children, they did so with the understanding that developmental disability services were funded via the existing Medicaid Waiver program. CBCs were not given supplemental funds to provide developmental services to the foster children. Nor were they told that [the Agency] would refuse to provide Medicaid funds for developmental services used by foster children.
There is no evidence in this record that services through the waiver program duplicate services available in the foster care program. Amber undeniably qualifies for the waiver program. The only issue is how quickly she will receive those services compared to other children. The Agency has not allowed her a higher place on the waiting list solely because she is receiving some services as a foster child. But those foster care services are not the same as *610 services she is eligible to receive pursuant to the waiver program, and the foster care services are not addressing her developmental disability. The Florida Legislature, through its statutory scheme, has not penalized foster children by blocking them from receiving the care they need. It has provided the children in the state's care the same opportunity as other children. Thus, in short, the Agency's ruling is contrary to the legislature's intent.
We do not purport to understand what services should be directed to Amber's emotional disturbance and what services should be directed to her needs as a developmentally disabled child. However, it is clear to us that the legislature has directed DCF and the Agency to coordinate a plan to serve Amber's complex needs within the available resources of both agencies.
As repeatedly pointed out in this opinion, the Agency has conceded that Amber is a danger to herself or others. There is no legal or factual basis for the Agency's position that the services she is requesting are available from another source or are actually provided by DCF. Therefore, we hold that Amber qualifies to be placed on the second priority of the crisis tier of the waiting list. We remand for the Agency to determine her placement within the second priority crisis list. In making that placement, the Agency may not rely upon the criterion that "other supports or services are available to assist in addressing [Amber's] behaviors" as a factor in that placement, because neither the facts nor the law support such a determination.
REVERSED and REMANDED for further proceedings consistent with this opinion.
ALLEN and POLSTON, JJ., concur.
NOTES
[1] At the time of Amber's denial of crisis status, the family safety program was the unit of Department of Children and Families responsible for caring for foster children. At the same time, the developmental disabilities program was the unit of Department of Children and Families responsible for administering the Medicaid waiver. However, in 2004, the Florida Legislature created the Agency for Persons With Disabilities and assigned that agency responsibility for the developmental disabilities program and the Medicaid waiver eligibility. See ch.2004-267, § 87 at 1141-42, Laws of Fla.
[2] This case was remanded to the Office of Appeal Hearings of DCF, which apparently retains jurisdiction to hold fair hearings of the Agency's actions under Florida Administrative Code Rule 65-2.042. Thus, although the Agency is the party appellee, the order under review is the order of the Office of Appeal Hearings of DCF. The procedural posture of this appeal is not raised by either party.
[3] The Medicaid statute provides that the state administering agency must require legally liable third persons or parties to pay for care and services before expending Medicaid funds for those services; or, if Medicaid funds have already been expended, then the state must recover reimbursement for that assistance to the extent of the third party liability. See 42 U.S.C. § 1396a(a)(25). Although the hearing officer briefly commented on this "payer of last resort" rule, on appeal the Agency does not attempt to establish that the family safety program is a legally liable third party for purposes of this rule. Thus, we do not address the payer of last resort issue.
[4] We find this reasoning to be curious in light of the fact that Amber has been placed on the waiver list. It is the "crisis status" which she has been denied. The Agency has at no time asserted that Amber is not eligible for waiver services.
[5] Section 409.1673(1)(f) provides:

It is necessary to promote the design and operation of an objective assessment in case planning process; to develop a community continuum of service for children in the custody of the department who require alternate care under chapter 39 or this chapter by ensuring that alternate care placements are based on the needs of the child and the family; and to encourage innovation in significantly restructuring local alternate care systems to be more flexible and efficient in providing protection and treatment services for dependent children.